Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence affirms in part and reverses in part the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 *********** RULINGS ON MOTIONS
1. Plaintiff objects to the deposition of Dr. Strader due to ex parte contact between the doctor and the employer on 17 December 1996, during which the doctor was shown the videotape of plaintiff's activity between November and December of 1996. As a result of the ex parte communication, Dr. Strader's opinion of plaintiff's claim became tainted, and any further treatment, diagnosis, or opinion of Dr. Strader regarding plaintiff's condition is deemed not to be credible. Plaintiff's motion is ALLOWED, and the testimony and records of Dr. Strader are hereby stricken insofar as they relate to any treatment or diagnosis of plaintiff provided by Dr. Strader following the date of the ex parte contact.
2. Plaintiff objects to the testimony of Dr. Francis Walker based upon the allegation that a rehabilitation nurse met with the doctor before the evaluation. The Full Commission finds insufficient evidence to support plaintiff's objection. Plaintiff's objection is OVERRULED, and the deposition of Dr. Walker is received into the record.
3. Plaintiff's objections to the private investigation reports and surveillance videotapes are OVERRULED, and this evidence is received into the record.
4. Plaintiff's Motion to Take Additional Evidence to the Full Commission is DENIED. Plaintiff's Motion to Receive Additional Medical Record Evidence Inadvertently Not Attached to Deposition Transcript and Supplemented to Stipulated Records at Hearing Level is hereby ALLOWED.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement which was filed on 12 March 1998, which are incorporated herein by reference, and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Defendant was a duly qualified self-insured, with Key Risk Management Services, Inc., as the servicing agent.
3. The employee-employer relationship existed between the parties at all relevant times.
4. On 18 September 1995, plaintiff sustained an admittedly compensable injury when she was struck in the left ankle area by a motorized pin truck. As a result of the accident, defendant filed a Form 60 through which plaintiff received temporary total disability benefits from 20 November 1995 to 25 February 1996 and from 17 June 1996 to 9 January 1997. She also was paid temporary partial disability benefits from 14 December 1996 to 12 January 1997.
5. Plaintiff's average weekly wage was $472.57, which yields a compensation rate of $315.06 per week.
6. The parties stipulated into the record all medical records, bills, reports, x-rays, or any other records of plaintiff's medical treatment for injuries sustained by reason of complaint against defendant; including from Jerry W. Noble, Ph.D., J. Simmons Riggan, M.D., Kevin L. Speight, N.D., Robert Teasdall, M.D., Leanne K. Willis, M.D., Francis D. Walker, M.D., Lexington Memorial Hospital Emergency Room, and Hunter S. Strader, M.D.
 ***********
Based upon all of the competent evidence adduced from the record, and the reasonable inferences therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 59 year old widowed female. She completed the eighth grade and is able to write, but her reading is very limited. She can read letters and bills, but she can not read a job application. Her mathematical skills are limited to being able to make change or count money at the store. Plaintiff had pre-existing lupus for which she was prescribed Prednisone.
2. Defendant hired plaintiff in 1976. She worked as a warping chopper, which consisted of placing yarn into a chopper. The job required plaintiff to stand for most of her 12 hour work shift. During her shift, plaintiff also spent some time packing bobbins.
3. On 18 September 1995, plaintiff sustained an admittedly compensable injury when she was struck in the left ankle area by a motorized pin truck. After the accident, plaintiff was taken to the Lexington Memorial Hospital emergency room where she was diagnosed with a contusion to the left Achilles tendon and abrasions to the left ankle. She was given pain medication and crutches.
4. On 3 October 1995, defendant referred plaintiff to Dr. Hunter Strader to direct her recovery from the industrial accident. Dr. Strader maintains a solo practice, but is under contract with defendant to come to defendant's plant once a week to attend to defendant's employees who have experienced work-related injuries. On examination by Dr. Strader, plaintiff was tender in the area of the second and third metatarsals. She also complained of jerking in her foot, thigh and calf. Dr. Strader found plaintiff capable of returning to a sitting job.
5. Upon her return to work, plaintiff was assigned to sort bobbin tubes and cut wedges in the reusable tubes. She was able to perform these job duties sitting or standing, but she complained of pain from lengthy sitting.
6. On 10 October 1995, plaintiff returned to Dr. Strader with complaints of pain in the first and second metatarsals. A nuclear bone scan showed no occult fractures. Dr. Strader prescribed Amytriptyline for plaintiff's neurological pain, and he referred her for an orthopedic consultation with Dr. J. Simmons Riggan.
7. On 17 October 1995, Dr. Riggan examined plaintiff. He found her to have a healing abrasion on the back of her left foot just above the Achilles tendon. He noted that dorsiflexion caused some discomfort over the midfoot, and that plaintiff was "quite tender to any light touch palpation over this area." Dr. Riggan agreed with the medication treatment recommended by Dr. Strader. On 24 October 1995, Dr. Riggan spoke with plaintiff over the telephone and explained that her x-rays showed a small amount of uptake in the posterior aspect of her calcaneus near the Achilles tendon, but that this was not due to a fracture, and there was no evidence of a stress fracture. He stated that the injury was primarily soft-tissue in nature, and that it would heal over time.
8. Plaintiff next presented to Dr. Riggan on or about 21 November 1995, and related that on 19 November 1995, she experienced an immediate recurrence of pain when she stood up at work. Plaintiff had swelling over the Achilles tendon which was tender. Dr. Riggan stated that it clinically appeared that there had been a partial tear of the tendon. He opined that the partial tear occurred directly as a result of her original injury and placed plaintiff in an equinous posterior plaster splint.
9. Plaintiff returned to Dr. Riggan on 27 November 1995 to have the splint removed. Dr. Riggan noted significantly less tenderness and swelling. He diagnosed plaintiff with a probable partial tear of the left Achilles tendon, and placed plaintiff in a fracture walker.
10. On 11 January 1996, Dr. Riggan noted that plaintiff had less pain and much less swelling, although she still experienced straining discomfort with maximum dorsiflexion. He removed the fracture walker and placed plaintiff in a Swede-o ankle brace. He allowed plaintiff to return to work as of 17 January 1996.
11. When plaintiff returned to work on 17 January 1996, she experienced what Dr. Riggan referred to in his notes as "exquisite pain." She returned to Dr. Riggan the next day, but he was unable to find any change in the swelling or tendon. He noted that plaintiff was experiencing "a lot of muscle spasm pulling the foot into a plantar flexion." He placed her back into the fracture walker and held her out of work for another week.
12. Dr. Riggan continued to see plaintiff weekly, and though he noted no change in the swelling and that plaintiff's tenderness had decreased, he did note that she retained a significant amount of muscle spasm. On 16 February 1996, Dr. Riggan noted that plaintiff went into spasm when allowed to plantar flex at the ankle, but that her tenderness had improved. He allowed plaintiff to begin to ambulate at home without the fracture boot and discussed letting her return to work the next week.
13. Plaintiff was released by Dr. Riggan, effective 1 March 1996, to return to work on an "adjusted duty schedule. Plaintiff was placed on the warping chopper job and was allowed to stand to operate the machine for approximately one hour, then take a 30 minute break. The position did not require a great deal of walking. Dr. Riggan recommended that plaintiff work "as she could tolerate it."
14. On 15 April 1996, plaintiff returned to Dr. Riggan complaining of a flare-up in her symptoms. Plaintiff had returned to work and was working as she could tolerate. Near the end of March she had increased her schedule to standing for two hours followed by a 30 minute break. Dr. Riggan noted that plaintiff would continue to have occasional flare-ups.
15. By 26 April 1996, plaintiff was regularly attempting to work eight hours a day at the warping chopper job, with breaks during the course of the day. During this time, Dr. Strader continued to monitor plaintiff's progress in her return to work efforts. On 30 April 1996, plaintiff reported to Dr. Strader that her pain was increasing, and he suggested alternating the warping chopper job with a sitting job every few hours.
16. On 10 May 1996, plaintiff's pain became so great that she had to leave work in a wheelchair. Dr. Strader examined plaintiff on 21 May 1996 and determined that she should be restricted to a sitting job.
17. On 3 June 1996, plaintiff presented to Dr. Riggan complaining of constant pain. She continued to work, but had difficulty standing for any length of time. Dr. Riggan offered the option of surgically debriding the scar tissue and placing plaintiff in a cast for six weeks, but plaintiff declined. Instead, an MRI scan of plaintiff's foot was scheduled.
18. On 25 June 1996, Dr. Strader saw plaintiff for a drawn left foot. On examination, Dr. Strader found plaintiff had toes drawn medially and severely flexed. Dr. Strader authorized plaintiff to remain out of work.
19. The MRI showed some mild thinning of the articular cartilage of the posterior and anteromedial aspects of the tibiotalar joint, but no abnormalities with the Achilles tendon. Plaintiff continued to experience a great deal of spasm in the posterior aspect of her left leg. Dr. Riggan was unable to offer any further suggestions regarding treatment, and he referred plaintiff to Dr. Robert Teasdall at the N.C. Baptist Hospital Foot Clinic. Dr. Teasdall was unable to explain plaintiff's symptoms, and advised a neurological consultation. Plaintiff was referred to Dr. Leanne Willis of The Johnson Neurological Clinic for further evaluation.
20. Dr. Willis saw plaintiff on 20 September 1996. Dr. Willis diagnosed plaintiff with possible dystonia, and referred plaintiff to Dr. Francis Walker, who was a specialist in motion disorders. While waiting for plaintiff to be evaluated by Dr. Walker, Dr. Willis recommended physical therapy and a TENS unit.
21. On 3 December 1996, Dr. Walker saw plaintiff for her leg spasms. Plaintiff reported that her left foot was drawn down and inward and that on one occasion her right foot had also been affected. Dr. Walker found this to be puzzling because these were not dystonic symptoms. Dystonia is a disorder characterized by an involuntary contraction of the muscles that are sustained. Most often these contractions are idiopathic without explainable origin. Dr. Walker found there was no objective basis for plaintiff's leg spasms and no reason for spasms in the right leg when the original injury was to the left foot. He further found that there appeared to be a voluntary component to plaintiff's spasms. When plaintiff was distracted, she did not have spasms; however, when attention was focused on her condition, the spasms occurred more frequently. Because there did not appear to be a significant action component to plaintiff's condition and the pain seemed to be way out of proportion to typical cases of dystonia, Dr. Walker found that plaintiff had a "complex disorder," but she did not have dystonia. He further found that plaintiff's left leg spasms were of unknown etiology, but that in cases of chronic pain a psychological component could be a factor.
22. On 14 December 1996, Dr. Walker released plaintiff to return to work. When plaintiff reported to work she was unable to walk to her workstation, and she was sent home.
23. Dave Ulmer, defendant's director of safety and plant protection, ordered video surveillance of plaintiff. On 17 December 1996, without the knowledge or consent of plaintiff, Mr. Ulmer showed a portion of the video lasting a few minutes to Dr. Strader, in which plaintiff was seen walking in shoes with heels of one to one and one half inches, for approximately half a block to and from her car at the funeral of a relative. According to Dr. Strader, plaintiff was not limping. Dr. Strader testified that the purpose of Mr. Ulmer showing him the tape was to cast doubt upon the extent of plaintiff's injury and her representation of the level of her disability. Dr. Strader's opinions were tainted by defendant's ex parte communication with him. Following their viewing of the video tape, Dr. Strader and Mr. Ulmer discussed plaintiff's veracity regarding her condition.
24. Due to the ex parte communication between defendant's agent and Dr. Strader, the purpose of which was to influence Dr. Strader's treatment and diagnosis of plaintiff, the remainder of his testimony and medical notes regarding treatment and diagnosis of plaintiff subsequent to 17 December 1996 is stricken, and is not considered by the Full Commission in the disposition of this matter.
25. In December 1996, Mr. Ulmer and personnel manager Kirkendall confronted plaintiff about the videotape. They accused plaintiff of being untruthful about her condition and exaggerating her condition.
26. Plaintiff returned to the tube salvage job on or about 10 January 1997, working four hours per day. She was instructed to gradually increase to full duty work by 28 January 1997. These instructions came from Dr. Strader, who was under the impression that plaintiff was at least in part fabricating her disability. Because Dr. Strader's treatment and diagnosis of plaintiff had been impermissibly tainted by his ex parte contact with defendant, the Full Commission gives no weight to his opinion that plaintiff was able to return to full duty work by 28 January 1997. Between 14 December 1996 and 12 January 1997, plaintiff received temporary partial disability compensation for various amounts. Plaintiff continued to work as much as she could tolerate due to her continuing pain through 16 July 1997.
27. On 3 February 1997, plaintiff returned to Dr. Riggan, primarily complaining of constant continuing pain. Plaintiff was still wearing the fracture boot. Dr. Riggan found plaintiff was suffering from chronic leg pain post partial tear to her left Achilles tendon and that she retained a 10% permanent partial impairment to her left foot. Dr. Riggan recommended plaintiff receive treatment from a pain control clinic.
28. On 25 March 1997, plaintiff was referred to Dr. Kevin Speight, a pain management specialist. After testing and consultation with Dr. Riggan, Dr. Speight determined that plaintiff did not have reflex sympathetic dystrophy. He found plaintiff had degenerative joint disease of the left ankle joint. He further opined that it was not unusual for a mechanical injury to become chronically painful, which could cause depression and which, in turn, could worsen the perception of continuing pain.
29. On 30 June 1997, plaintiff sought psychological counseling from Jerry Noble, Ph.D., upon referral from her attorney. Dr. Noble referred plaintiff to a psychiatrist to write prescriptions for medication for her psychological conditions. Although plaintiff did not receive authorization from either defendant or the Industrial Commission for this treatment, the undersigned note that the only physician plaintiff was still seeing at this time was Dr. Strader, and neither Dr. Strader nor any of the other physicians who had provided plaintiff with treatment had successfully effected a cure or provided relief for her condition.
30. Dr. Noble diagnosed plaintiff with major depression, due at least in part to her work-related injury. There was some question as to whether the death of plaintiff's husband several years earlier contributed to the level of plaintiff's depression; however, Dr. Noble stated that plaintiff's depression most clearly rested on the occupational injury and the circumstances at work.
31. On 16 July 1997, plaintiff returned to Dr. Noble. She stated at that time that the job she was performing at work required her to stand, that she could not stand on a protracted basis, and that there were no sitting assignments available to her. Plaintiff related that she had been subject to teasing and criticism at work specifically accusing her of faking her physical problems, and that she had received the same reactions from management. These incidents caused plaintiff great embarrassment, and further complicated her depression. For these reasons, Dr. Noble recommended that plaintiff not return to work.
32. Plaintiff next saw Dr. Noble on 28 July 1997, with increased depression. Dr. Noble recommended that she continue individual psychotherapy, that she consult a psychiatrist or physician about obtaining psychotropic medications, and that they pursue a course of psychological testing to determine whether her symptoms might be abated sufficiently to allow her to return to work.
33. The tests administered to plaintiff yielded inconsistent responses, in that plaintiff tended to agree or answer "true" indiscriminately. Dr. Noble decided to test plaintiff's ability to understand the questions she was reading. Following testing for verbal IQ, performance IQ, and overall IQ. Dr. Noble found that plaintiff's verbal IQ score was at approximately the bottom one percent of people in her age group. Her performance IQ was the same. Plaintiff's full scale IQ measured 62, in a range for a mildly mentally retarded person. Plaintiff was thereafter given a range of tests to determine her basic academic abilities. Plaintiff was reading at a first grade level, and spelling at a kindergarten level. Her arithmetic scores were at the first grade level. Dr. Noble repeated the original tests, giving them via audiotape so plaintiff did not have to read the questions. Again, plaintiff tended to answer true and agree without regard to the actual question.
34. Further testing tended to show that plaintiff has an inconsistent problem-solving style, that she is inept in responding to stressful situations and tends to obsess about them. There was evidence of depression, hopelessness, self-pity, and suicidal thoughts, and indications of feelings of betrayal and mistrust.
35. Dr. Noble was of the opinion and the Full Commission finds that plaintiff's current depression is directly related to the workplace injury and the subsequent treatment by her co-workers and management. As a result of her depression and continuing pain, Dr. Noble stated that plaintiff could not safely return to work for defendant. Further, due to plaintiff's age, vocational experience, intellectual limitations and education level, as well as her current psychological condition, it would be difficult for plaintiff to obtain other employment. Dr. Noble also opined and the Full Commission finds that because plaintiff has difficulty approaching challenging or novel situations, obtaining employment at another job would render her vulnerable to further depression.
36. The record in this case contains a letter dated 14 July 1997 from defendant's then-counsel, G. Thompson Miller to Ms. Phyllis Brookbank of Key Risk Management Services, in which Mr. Thompson states that plaintiff's counsel called him seeking approval for Dr. Noble to be designated as plaintiff's treating physician. Mr. Thompson forwarded the request to Ms. Brookbank with the recommendation that the request be denied. There is no further reference to this issue in the record. Based on the evidence of record, plaintiff timely requested that defendant authorize Dr. Noble as plaintiff's treating psychologist prior to or shortly after 30 June 1997. There is no evidence of defendant's response. Dr. Noble's treatment of plaintiff is authorized.
37. Since leaving the employ defendant on 17 July 1997, pursuant to the instructions of her treating physician, Dr. Noble, plaintiff remains unemployed.
38. Plaintiff has not reached maximum medical improvement and continues to be treated by Dr. Noble.
39. Given plaintiff's current condition which is primarily due to her history with defendant, as well as defendant's inability to provide regular employment within plaintiff's capabilities, plaintiff cannot return to work for defendant.
40. Given plaintiff's current medical condition and physical limitations, her age, vocational experience, intellectual functioning level and educational level, it would be futile for her to attempt to find suitable employment in the competitive job market. Plaintiff is totally disabled.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. On 18 September 1995, plaintiff suffered an injury by accident to her left ankle and leg which arose out of and in the course of her employment with defendant when she was hit in the left ankle by a motorized pin truck. Defendant admitted liability on a Form 60. N.C. Gen. Stat. § 97-2.
2. As a result of her injury by accident, plaintiff suffers from disabling depression which is a direct and natural consequence of her work injury and is therefore compensable. N.C. Gen. Stat. § 97-2.
3. An employee seeking disability must establish the existence and extent of her disability. Franklin v. Broyhill Furniture Industries,123 N.C. App. 200, 472 S.E.2d 382 (1996). Plaintiff in this case has established that she is incapable of earning wages in her previous employment, and that due to physical limitations caused by her injury, her depression, her age, past work experience, limited and low level of intellectual functioning, it would be futile for her to seek suitable employment in the competitive job market. Accordingly, plaintiff has demonstrated that she is totally disabled as a direct result of her work-related injury. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to compensation paid by defendant in the weekly amount of $315.06, beginning on 17 July 1997 and continuing until further order of the Commission upon defendant's showing of a change of condition. N.C. Gen. Stat. § 97-29.
5. Plaintiff is entitled to have defendant pay for all medical treatment designed to effect a cure or provide relief from her work injury-related condition, including past and future psychological or psychiatric care provided by or through Dr. Noble. N.C. Gen. Stat. §97-25.
6. In Salaam v. N.C. Dept. of Transportation, 122 N.C. App. 83,468 S.E.2d 536, disc. review improvidently allowed, 345 N.C. 494,450 S.E.2d 51 (1997), the N.C. Court of Appeals held that ex parte communication between defendant or defense counsel and a plaintiff's physician was improper, and required that subsequent statements offered by the physician be stricken from the record. In this case, Dave Ulmer, an agent of defendant, conducted ex parte communications with Dr. Strader, plaintiff's treating physician. The ruling in Salaam has been held to apply to agents of a defendant; therefore, the Full Commission must strike Dr. Strader's testimony. See Jenkins v. Public Service Co. of NorthCarolina, 134 N.C. App. 405, 518 S.E.2d 6 (1999). However, the Full Commission finds it is unnecessary to strike all of Dr. Strader's testimony; instead, only that portion of his testimony which relates to the ex parte communication must be excluded. To do otherwise would operate to punish plaintiff for the improper conduct of defendant. Porterv. Fieldcrest Cannon, Inc., 133 N.C. App. 23, 514 S.E.2d 517 (1999). The evidence of record demonstrates that the agent of defendant presented a skewed and incomplete video record to Dr. Strader in an attempt to distort his view of plaintiff's truthfulness, and that the attempt was successful. Accordingly, the Full Commission has determined that Dr. Strader's testimony regarding plaintiff's condition subsequent to the ex parte communication must be stricken.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, defendant shall pay total disability compensation at the rate of $315.06 per week beginning on 17 July 1997 and continuing until further order of the Commission upon defendant's showing of a change of condition.
2. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in paragraph 1 above is hereby approved to be deducted from sums due plaintiff and paid directly to counsel.
3. Defendant shall pay all medical expenses incurred or to be incurred in the future including psychological or psychiatric treatment provided by and through Dr. Jerry Noble when bills for the same have been approved, in accordance with the provisions of the Act.
4. Defendant shall pay the costs of this action.
This the ___ day of July, 2001.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER